1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR ABDUL-HAMEED, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SNAP INC., EVAN T. SPIEGEL, and DEREK ANDERSEN, <br><br> Defendants. | Case No. 2:25-CV-07844 <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Omar Abdul-Hameed ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Snap, Inc. ("Snap" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Snap's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Snap securities between April 29, 2025, to August 5, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Snap's advertising revenue expectations for the second quarter and full year fiscal 2025. Defendants' statements included, among other things, confidence in Snap's ability to execute on its advertising growth potential and in management's claims that ongoing headwinds in April were externally sourced, coupled with the minimization of both the significance of such headwinds and the magnitude of their impact.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Snap's advertising revenue growth rate; notably, that, due to Snap's own execution failure, it had significantly declined from 9% in the first quarter to only 1% in April. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Snap's securities at artificially inflated prices.

4.      On August 5, 2025, Snap announced its financial results for the second quarter of fiscal 2025, disclosing a deceleration in advertising revenue growth. The Company attributed the slowdown to "an issue related to our ad platform, the timing of Ramadan and the effects of the de minimis changes."

5.      Investors and analysts reacted immediately to Snap's revelation. The price of Snap's common stock declined dramatically. From a closing market price of $9.39 per share on August 5, 2025, Snap's stock price fell to $7.78 per share on August 6, 2025, a decline of about 17.15% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Snap is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Snap common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Snap is attached hereto.

12.     Snap, Inc. is a California corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "SNAP."

13.     Defendant Evan T. Spiegel ("Spiegel") was, at all relevant times, the Co-Founder, Chief Executive Officer, and a Director of Snap.

14.     Defendant Derek Andersen ("Andersen") was, at all relevant times, the Chief Financial Officer of Snap.

15.     Defendants Spiegel and Andersen are sometimes referred to herein as the "Individual Defendants." Snap together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Snap's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available

to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Snap is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Snap under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

19.    Snap is a technology company best known for Snapchat, a visual messaging application.

20.    Snapchat connects brand and direct response advertisers to customers through the Snapchat platform.  Snapchat offers multiple different ad types, integrations, and locations, and provides the ability for entities to bid for more targeted ad placements.

### B.    The Defendants Materially Misled Investors Concerning Snap's Expectations for the Second Quarter of Fiscal Year 2025

#### *April 29, 2025*

21.    On April 29, 2025, Defendants issued a press release announcing first quarter fiscal 2025 results. During the accompanying earnings call, Defendant Spiegel touted Snap's advertising revenue growth, stating, in pertinent part:

4

In Q1, our community grew to 460 million daily active users, an increase of 38 million year-over-year, and content viewers and total time spent watching content grew year-over-year. Q1 revenue increased 14% year-over-year to $1.36 billion, driven by the progress we have made with our direct response advertising solutions, continued momentum in driving performance for small and medium-sized businesses and the growth of our Snapchat+ subscription business. The benefits of our more focused investments are now evident in our improved profitability and free cash flow generation.

. . .

Given the progress we have made with our advertising platform, and the pace of execution against our 2025 strategic priorities, we believe we are well positioned to deliver improved business performance and meaningful positive free cash flow as we make further progress towards GAAP profitability.

22.     Defendant Andersen took over the prepared remarks to pertinently provide the financial breakdown of the Company's results and management's broad expectations for their advertising platform, stating:

In Q1, total revenue was $1.363 billion, up 14% year-over-year, and up 15% year-over-year on a constant currency basis. Advertising revenue was $1.211 billion, up 9% year-over-year, driven primarily by growth from DR advertising revenue, which increased 14% year-over-year.

Brand-oriented advertising revenue was down 3% year-over-year due to a combination of softness in upper funnel demand across all regions, as well as the ongoing shift in the mix of our advertising business toward performance-oriented advertising solutions. This mix shift is evident in the fact that direct response advertising revenue contributed 75% of our total advertising revenue for the first time in Q1.

. . .

North America revenue growth accelerated to 12% year-over-year in Q1, up from 8% in the prior quarter. With a faster growth rate in Q1, driven primarily by a higher rate of Direct Response advertising revenue growth. Europe revenue grew 14% year-over-year, and Rest of World revenue grew 20% year-over-year, with softer brand-oriented

advertising demand in these regions, partially offsetting continued strong growth in Direct Response advertising revenue, and continued momentum in the SMB customer segment, in particular, in these regions.

23.    Defendant Andersen then broadly provided management's expectations for the coming quarter, stating, in pertinent part:

> Given the uncertainty with respect to how macroeconomic conditions may evolve in the months ahead, and how this may impact advertising demand more broadly, we do not intend to share formal financial guidance for Q2. ***While our top line revenue has continued to grow, we have experienced headwinds to start the current quarter, and we believe it is prudent to continue to balance our level of investment with realized revenue growth***. As a result, we are updating our full year cost structure guidance to reflect our current investment plans.
>
> . . .
>
> ***While there is uncertainty regarding the macro operating environment, we remain optimistic about the long-term prospects for our business***. We remain optimistic because of the progress we have made with our ad platform to improve performance for our advertising partners, because of the progress we have made to diversify our advertiser base as well as our revenue sources with the growth of Snapchat+. ***Because of our demonstrated ability to prioritize our cost structure to balance investment with top line growth over time***, and because we have built a strong balance sheet with the financial flexibility necessary to maintain strategic focus through volatile macro conditions.
>
> Moving forward, we will remain focused on executing against our strategic priorities of growing our community and improving depth of engagement, driving top line revenue growth and diversifying our revenue sources, and building toward our long-term vision for augmented reality.

(Emphasis added).

24.    During the question-and-answer segment, Defendants discussed their expectations for the ad platform and Snap's progress in the ongoing second quarter during the following pertinent exchanges:

<Q: Ross Adam Sandler – Barclays Bank PLC – MD of Americas Equity Research & Senior Internet Analyst> Great. I got to ask the obligatory macro question. So I think everybody is curious what you guys are seeing thus far here in the second quarter on both brand and DR. It sounds like you're growing, but you're starting to see some impact. So I guess, could you just give us a little more color on what categories or what segments of the business are seeing an impact?

. . .

<A: Derek Andersen> . . . At a high level, the macro is changing quickly. And I think the path we're concerned here going forward is an entirely clear that obviously impacts visibility on our end. We've learned from some of the big past macro events that we experienced in external events to be thoughtful about how this can impact the operating environment and therefore, our approach to guidance generally.

We've had a really solid Q1 top line growth at the very high end of our guide range and then both adjusted EBITDA and net income well above those ranges. So we started the year really strong. ***Thus far in Q2, we're still growing. But we've seen some headwinds to our top line growth so far.***

As one example, we've heard from a subset of advertisers that their spending has been impacted by the changes to the de minimis exemption. However, I caution here, it's just really difficult to parse the drivers between the various potential factors there. ***We're just really focused on continuing to execute for our customers and to build on the momentum we saw in Q1 with active advertisers up to 60%, DR advertising revenue reaching 70% of total ad revenue for the first time.***

. . .

<Q: Richard Scott Greenfield – Lightshed Partners, LLC – Partner and Media & Technology Analyst> I guess one of the big questions that everyone is trying to understand, you've been sort of in that mid-teens-

7

ish, low to mid-teens-ish growth rate for Direct Response advertising. The comp was definitely harder this quarter than it's been in a long time. But I think as you sort of look at the investments you've been making, the rollout of new products like Sponsored Snaps, what will it take to deliver 20-plus percent growth in the DR business?

Like do you have line of sight to like what needs to happen or how long it will take to sort of get that to be a 20-plus percent growth business? And then just 2 housekeeping things, Derek. One of the de minimis that you just mentioned, anything that you could say in terms of how much China-based advertisers is a percentage of your revenue?

And on the guidance comment, the forward-looking that April is continuing to grow, I've gotten a lot of questions. Is advertising growing? Or is it -- if you look -- excluding Snap+, is it still growing, excluding Snap+, as you look into April because everyone is trying to isolate what's happening in core ad business given everything that's happened with tariffs?

<A: Evan T. Spiegel> Yes. We're really excited about the progress we've been making on the Direct Response business over the past couple of years, we've really invested heavily there. I think -- just thinking big picture in terms of the contributors to accelerating to 20% from, I think, about 14% we're at today. ***Of course, we're going to continue the ongoing ad platform improvements. We've mentioned on the call, including larger and fresher models and better signal utilization.***

***I think in terms of the product road map and the product pieces, we've got a really good road map for our app goal-based bidding objectives, and for dynamic product ads as well that will land throughout the year.*** And then I think bringing Direct Response goal-based bidding objectives to new placements like Sponsored Snaps will also be a contributing factor as well.

. . .

<A: Derek Andersen> . . . On the China-based advertisers, we don't really break it down at that level of detail. We've not previously disclosed that market as a breakout market in our Qs and Ks. So in some ways, that perhaps is helpful in and of itself.

8

***And look, we're early in the quarter. We're only a few weeks in. You were [sic] continuing to grow as a business, but we've seen some headwinds thus far.*** I think it's early. And of course, there's a lot of quarter ahead of us and the macro uncertainty and how that's going to evolve over time. So we're going to keep watching it and monitoring the growth of the business and go from there. So hopefully, that gives you a little bit more color on the China base side of things.

. . .

<Q: Kenneth James Gawrelski – Wells Fargo Securities, LLC – Equity Analyst> Maybe first, you could talk a little bit about the kind of progression through the first quarter on the ad side. And as you go into April, any particular categories that you're seeing, or geographies that you're seeing changes in performance? Maybe we'll start there and 1 follow-up after that.

<A: Derek Andersen> . . . ***In terms of what we're seeing early here in the new quarter, we're just a few weeks in. It's very early in the going. As I said earlier, the business is continuing to grow, but we have seen some headwinds to start the quarter to the growth rate***. As I mentioned earlier, one example of a factor that we've seen as a driver there is some advertisers that have been impacted by the changes to the de minimis exemption. But as I also said earlier, it's really difficult, this early in the going, to parse the different drivers that can be impacting that. ***So we're going to continue to watch it really carefully***. And of course, where we head from here on the macro and some of the factors there is also uncertain.

***So the key is that we stay focused on executing for our customers, improving the ad platform*** and that we continue to be thoughtful about balancing our investment levels over time to make progress for the business financially. So hopefully, that gives you a little bit more color on your question.

. . .

<Q: Benjamin Thomas Black – Deutsche Bank AG – Research Analyst> You mentioned hitting 900 million DAUs and that you're

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approaching 1 billion yet. North America DAUs contracted sequentially. I know you've been working on a number of initiatives to restimulate growth in North America. So curious to hear what is potentially not working? And what gives you confidence that those trends can inflect positively again?

<A: Evan T. Spiegel> . . . In North America, in particular, we sort of trended around this 100 million, 99 million DAU sort of number. ***We're not expecting further declines here in Q2 in North America. And the things that sort of make us confident or that we're excited about are really the engagement around snapping that is so core to the service***, people making and sending snaps with their friends. So we've seen some positive trends there. We're continuing to build on those overall and then continuing to invest in the content business as well.

(Emphasis added).

25.     The above statements in Paragraphs 21 to 24 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's expected advertising revenue and anticipated growth while emphasizing potential macroeconomic instability. In truth, Snap's optimistic reports of advertising growth and earnings potential fell short of reality as they relied far too heavily on Snap's ability to execute on its potential; Snap was already experiencing the ramifications of a significant execution error when Defendants' claimed a lack of visibility due to macroeconomic conditions.

## C.     The Truth Emerges during Snap's Second Quarter Earnings Report

### *August 5, 2025*

26.     On August 5, 2025, Defendants released disappointing second quarter, fiscal year 2025 results, disclosing that advertising revenue decelerated significantly in the quarter.  In pertinent part, Defendant Andersen stated:

As our global community continues to grow, we have continued to scale our top line with total revenue reaching $1.345 billion in Q2 and up 9%

10

year-over-year. Our rate of top line growth was impacted by a number of factors in Q2, including *an issue related to our ad platform, the timing of Ramadan and the effects of the de minimis changes*. Unfortunately, in our efforts to improve advertiser performance, *we shipped a change that caused some campaigns to clear the auction at substantially reduced prices. We have since reverted this change and advertising revenue growth has improved as advertisers adjust their bid strategies to achieve their objectives*.

Despite these headwinds, *advertising revenue reached $1.174 billion in Q2, up 4% year-over-year*, driven primarily by growth from DR advertising revenue, which increased 5% year-over-year.

(Emphasis added).

27.    Defendant Andersen elaborated on the timing and details of the error to the company's advertising auction during the question-and-answer portion that followed:

One of them certainly is the one you mentioned around the ad platform. We also had a factor around the timing of Ramadan, which was less of a benefit in Q2 than in the prior year. And as well, there was the impact of the de minimis changes in the quarter.

. . .

So if you recall, we grew ad revenue at a rate of approximately 9% in Q1. *And what we saw in April is that ad revenue growth declined to approximately 1% before largely recovering as we move through May* and what you saw *in May is, number one, we've gone to the work of reverting the ad platform change*, but also the factor around Ramadan obviously being diminished during that period of time. So we saw the recoveries we went through May.

. . .

So the big focus at this point is building demand we have seen post the rollback of the ad change as we moved through June and into July. We've seen ad revenue specifically growing at a rate between 3% to 4% *so give you a sense of how the topography sort of moved from 9% in Q1 to approximately 1% ad revenue in April than to a rate of*

11

***recovering largely in May and then we're looking at 3% to 4% plus the roll back to that change***.

(Emphasis added).

28. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the April 29, 2025, earnings call. On that call, Defendants praised their continued growth and promised to stay "focused on continuing to execute for our customers," while deferring guidance on potential macroeconomic risk and alleged reduced visibility. Defendants made no mention of an ongoing advertising issue, nor did they suggest the significant degree to which Snap's advertising growth rate had declined in April.

29. Investors and analysts reacted immediately to Snap's revelation. The price of Snap's common stock declined dramatically. From a closing market price of $9.39 per share on August 5, 2025, Snap's stock price fell to $7.78 per share on August 6, 2025, a decline of about 17.15% in the span of just a single day.

30. A number of well-known analysts who had been following Snap published negative reports in response to Snap's disclosures. For example, Rosenblatt, while retaining their neutral rating, highlighted Snap's disappointing advertising revenue growth, stating, in pertinent part:

> Snap's 2Q25 had an odd mishap. The company said an update to its ad auction system caused Snap to mistakenly auction ad inventory in April at a substantial, unintended discount, stalling ad growth at 1%, before the issue was fixed and ad growth stepped back up to ~ 4% for 2Q25. But even at this recovered pace, which is seen persisting in this zip code into 3Q25, ad growth is well below the 9% rise of 1Q25, and the 10% we had been estimating for 2Q25.

31. Similarly, J.P. Morgan, while maintaining their below-market price target, opened by highlighting that Snap's "Ad revenue decelerated to +4% Y/Y in 2Q (vs. +9% Y/Y in 1Q), including +1% Y/Y in April driven by an ad platform issue that temporarily reduced auction prices." Further, the analyst noted that investor

expectations "had increased in recent days following strong broader advertising industry results/outlooks" than had been previously anticipated.

32. HSBC also maintained their below-market price target while noting that Snap's "2Q25 sluggish ad revenues drive negative market reaction." The analyst highlighted Snap's overall growth slowdown, noting that, despite "that growth had returned to a c4% y-o-y pace in July" following the "faulty product update," it was still well behind market leaders, such as "Meta's guidance for c21% y-o-y growth in 3Q25."

33. The fact that these analysts, and others, discussed Snap's advertising growth shortfall and competitor outperformance suggests the public placed significant weight on Snap's prior statements regarding potential headwinds to its advertising revenue growth rate. The frequent, in-depth discussion of Snap's April execution error confirms that Defendants' statements during the Class Period were material.

### D. Loss Causation and Economic Loss

34. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Snap's common stock and operated as a fraud or deceit on Class Period purchasers of Snap's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Snap's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Snap's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

35. Snap's stock price fell in response to the corrective event on August 5, 2025, as alleged *supra*. On August 5, 2025, Defendants disclosed information that

was directly related to their prior misrepresentations and material omissions concerning Snap's forecasting processes and growth guidance.

36.    In particular, on August 5, 2025, Snap announced results for the second quarter of fiscal year 2025 below expectations and blamed those results largely on the Company's own faulty execution in April, despite management previously, at the end of the same month, refraining from issuing concrete guidance pointing to a lack of visibility due to macroeconomic uncertainty.

### E.    Presumption of Reliance; Fraud-On-The-Market

37.    At all relevant times, the market for Snap's common stock was an efficient market for the following reasons, among others:

(a)    Snap's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Snap communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Snap was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Snap was reflected in and incorporated into the Company's stock price during the Class Period.

38.    As a result of the foregoing, the market for Snap's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Snap's stock price. Under these circumstances, all purchasers of Snap's common stock during the Class Period

suffered similar injury through their purchase of Snap's common stock at artificially inflated prices, and a presumption of reliance applies.

39.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### F.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

40.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

41.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

42.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Snap who knew that the "forward-looking statement" was false.

Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Snap securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Snap's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Snap or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of August 1, 2025, there were 1.435 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Snap;

(c)     whether the Individual Defendants caused Snap to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Snap's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

17

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Snap common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Snap's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities

18

analysts and the media that were designed to influence the market for Snap's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

53.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Snap's internal affairs.

55.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Snap's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Snap's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Snap's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Snap's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Snap's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Snap's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Snap's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

# COUNT II

## *Against the Individual Defendants*

## *for Violations of Section 20(a) of the Exchange Act*

59.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Snap's misstatements.

61.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Snap which had become materially false or misleading.

62.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Snap disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Snap to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Snap's common stock.

63.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Snap to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised

control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.    By reason of the above conduct, the Individual Defendants and/or Snap are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated:  August 21, 2025                     Respectfully submitted,


                                            **LEVI & KORSINSKY LLP**

                                            /s/ Adam Apton
                                            Adam M. Apton (SBN 316506)
                                            515 South Flower Street
                                            18th and 19th Floors
                                            Los Angeles, CA 90071
                                            Tel: (213) 985-7290
                                            Email: aapton@zlk.com

                                            *Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS